UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | |
|---|---|
| LEAH MILES-CACELLA and <br> MARGARET KENNEDY <br> *Plaintiffs,* <br><br> v. <br><br> INTERNATIONAL FELLOWSHIP <br> OF CHRISTIANS AND JEWS, <br><br> *Defendant.* | Case No. 18CV7563 <br><br><br> JURY DEMANDED |

## COMPLAINT

Plaintiffs, Leah Miles-Cacella and Margaret Kennedy (hereinafter "Miles-Cacella" or "Kennedy" individually or "Plaintiffs" in conjunction), by and through undersigned Counsel, allege the following against Defendant, the International Fellowship of Christians and Jews (hereinafter "Defendant"):

**I.      NATURE OF THE CLAIMS**

This is an action brought to remedy discrimination in employment on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*, the Illinois Human Rights Act, 775 ILCS 5/2 *et seq.* ("IHRA") and the Illinois Wage Payment and Collection Act ("IWPCA") 820 ILCS 115/1 et seq. Plaintiffs seek declaratory and injunctive relief and other compensatory and equitable make-whole relief both to secure future protection and to redress the past deprivation of the rights promised to them under federal and state law.

**II.     JURISDICTION AND VENUE**

1

1. This Court has jurisdiction over Plaintiff's federal claims pursuant 42 U.S.C. § 2000e-5(f)(3) (Title VII) and 28 U.S.C. § 1331 (federal question).

2. This Court has supplemental jurisdiction over Plaintiffs' state law claims, pursuant to 42 U.S.C. § 1367.

3. Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b), because the Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims alleged occurred in this District.

### III. PARTIES

#### a. PLAINTIFF LEAH MILES-CACELLA

4. Miles-Cacella worked for the Defendant from March 23, 2016 until December 31, 2017.

5. Miles-Cacella has met all administrative prerequisites for filing suit under Title VII, 42 U.S.C. § 2000e. On February 8, 2018, Plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC") of gender discrimination including disparate treatment and retaliation under Title VII and the Illinois Human Rights Act. (Exhibit A). On August 20, 2018, the EEOC issued a Right to Sue letter. (Exhibit B). Miles-Cacella has filed this complaint within 90 days of the receipt of notice of the right to sue.

6. At all times relevant to this Complaint, Miles-Cacella was an employee of the Defendant as defined by Title VII and the IHRA. 42 U.S.C. § 2000e(f); 775 ILCS 5/2-101(A).

#### b. PLAINTIFF MARGARET KENNEDY

7. Kennedy worked for the Defendant from May 6, 2008 until February 2, 2018.

8. Kennedy has met all administrative prerequisites for filing suit under Title VII, 42 U.S.C. § 2000e. On December 13, 2017, Plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC") of sexual harassment and gender discrimination including disparate

treatment and retaliation under Title VII and the Illinois Human Rights Act. (Exhibit C). On October 22, 2018, the EEOC issued a Right to Sue letter. (Exhibit D). Kennedy has filed this complaint within 90 days of the receipt of notice of the right to sue.

### c. DEFENDANT INTERNATIONAL FELLOWSHIP OF CHRISTIANS AND JEWS

9. The Defendant is a 501(c)(3) non-profit organization and operates within the State of Illinois. The Defendant is and was at all times relevant to the Complaint Plaintiffs' "employer" as defined by Title VII and the IHRA. 42 U.S.C. § 2000e(b); 775 ILCS 5/2-101(B).

### IV. FACTUAL ALLEGATIONS

10. Plaintiff re-alleges Paragraphs 1-9 and incorporates them as though fully set forth herein as Paragraph 10.

### a. Plaintiff Leah Miles-Cacella

11. Miles-Cacella began her employment on March 23, 2016.

12. The IFCJ heavily recruited Miles-Cacella for months due to her extensive and accomplished experience in fundraising.

13. Miles-Cacella has a reputation of being one of the area's best-known fundraisers with over twenty years of non-profit management experience with great successes in large scale fundraising events.

14. The IFCJ hired Miles-Cacella and five others.

15. At the time of her hire, Miles-Cacella's immediate supervisor was Irv Geffen.

16. As part of Miles-Cacella's original employment agreement with the Defendant, Miles-Cacella's salary was $200,000.

17. At the time of her hire, Defendant agreed to give Miles-Cacella a 12.5% raise ($25,000.00) after her 6-month performance review provided she reach certain, but undefined, metrics.

18. After 6 months, Plaintiff completed a self-evaluation form and had a meeting with Mr. Geffen to discuss her performance.

19. Mr. Geffen gave her a "high-five" and told her she was doing a great job.

20. Defendant also administered first-year performance review with Miles-Cacella. It was a positive review.

21. Thus, Miles-Cacella was eligible for, and therefore entitled to, the pay raise of $25,000 per year she had been promised by Defendant at the time of her hire.

22. Miles-Cacella's team was tasked with forming the Jewish Giving Partnership where they would raise money by launching a Holocaust Survivor Campaign.

23. As Miles-Cacella and her team got to work on the program, it became clear that the IFCJ was not prepared to provide the requisite support for them to be successful. As a result, the IFCJ terminated all of Miles-Cacella's team in February 2017, but kept Miles-Cacella on staff.

24. In March 2017, the IFCJ conducted a yearly performance review. Miles-Cacella received glowing remarks.

25. Although she was no longer doing what she was originally hired to do, the performance review was an acknowledgement of Miles-Cacella's skills and work ethic.

26. In her newly assigned role, Miles-Cacella was tasked to lead a large-scale fundraising event which would take place in December 2018 - Spring 2019. This type of event would require a great deal of Miles-Cacella's time.

27. She was successfully able to recruit event pledges from two donors for a combined $250,000.

28. Meanwhile, she was responsible for courting existing donors and soliciting new donors. Miles-Cacella was starting to show great progress in her efforts.

29. Her new role also brought her in closer contact with Global VP George Mamo.

30. As Miles-Cacella's superior, Mr. Mamo began to monitor and scrutinize Plaintiff's performance.

31. Mr. Mamo also acted inappropriately towards Miles-Cacella.

32. On one occasion, Mr. Mamo and Miles-Cacella had a meeting in the Chicago Office. At the start of the meeting, Mr. Mamo gave Miles-Cacella a hug that made her uncomfortable. He pressed his body against her breasts. During the meeting Mr. Mamo proceeded to stare at Miles-Cacella's breasts and would not look her in the eye.

33. Mr. Mamo created constant stress for Miles-Cacella which significantly affected her work life. Miles-Cacella reached out to Jeff Kaye who was her supervisor at the time, who told her he was her "safe place."

34. Miles-Cacella began to talk with other women in the IFCJ (present and past employees) and discovered that they had experienced similar treatment from Mr. Mamo.

35. And so, she began to complain about the behavior to other coworkers.

36. In May 2017, Miles-Cacella met with Mr. Mamo again in the Chicago office. This time, his demeanor was markedly hostile and rude. Miles-Cacella left the meeting in tears.

37. Within a month, Mr. Seth Moskovitz was hired at the IFCJ and became Miles-Cacella's immediate supervisor.

38. During this time Plaintiff shared the issues about Mr. Mamo to Kenneth Wagner, a consultant with the IFCJ as well as Margaret Kennedy, IFCJ Director of Direct Response and Donnie Williams, videographer.

39. In October 2017, following the aftermath of Hurricane Irma in Florida, where Miles-Cacella lives, Mr. Moskowitz called her to inform her that she was being put on probation.

40. She was also given a fundraising goal of $250,000 to make by the year's end however, the Kobel pledge of $200,000 she had received earlier was to be excluded.

41. Miles-Cacella felt this was a clear sign that the IFCJ was not willing to accept her successes and wanted to terminate her because she is female and because she spoke out about sexual harassment.

42. On October 23, 2017, Miles-Cacella emailed Mr. Mamo and Mr. Moskowitz about her reservations for reaching the goal. Upon receipt of her email, George Mamo wrote back and offered her the opportunity to resign with one month's compensation.

43. Miles-Cacella replied to Mr. Mamo expressing her commitment to the organization and her intent to remain on staff.

44. Mr. Mamo responded by stating that if Miles-Cacella felt she could not achieve such a task, the IFCJ would offer her a four-week severance.

45. Despite the unrealistic goal and the unfair terms, since she had already raised four-fifths of the yearly goal, Miles-Cacella said she did not want to leave the IFCJ and she would work to meet the number.

46. On October 30, 2017, Miles-Cacella forwarded the letter she wrote to Mr. Moskovitz to IFCJ President Rabbi Eckstein. She also began to communicate the unfair treatment with Rabbi Eckstein.

47. On October 31, 2017, Rabbi Eckstein wrote to Miles-Cacella and asked for her permission to investigate this further informing her it would then become public record. Miles-Cacella agreed.

48. A short time after that, Miles-Cacella found out that the IFCJ had hired an attorney to investigate the harassment and gender discrimination allegations as Rabbi Eckstein had mentioned in his correspondence to her.

49. Ms. Kennedy mentioned to Miles-Cacella that she spoke to Executive Senior VP Yael Eckstein, Rabbi Eckstein's daughter, about Miles-Cacella's reluctance to come forward about Mr. Mamo for fear of reprisal.

50. However, within a month after complaining to Rabbi Eckstein, the attorney reached out to Miles-Cacella. After back and forth emails the attorney and Miles-Cacella had a one-on-one meeting on December 13, 2017.

51. While all of this was going on, Miles-Cacella managed to procure a $50,000 pledge from a donor to the IFCJ. With the combined $200,000 pledge from another donor, Miles-Cacella exceeded her 2017 goal of $250,000. This was no easy accomplishment and her efforts had been previously recognized to senior leadership by board member, JR Dupell.

52. On December 29, 2017, a donor fulfilled $150,000 of their $200,000 pledge to IFCJ.

53. While on vacation, Miles-Cacella texted Mr. Moskovitz to let him know that it was received and wished him a Happy New Year.

54. Shortly after the text, Mr. Moskowitz left Miles-Cacella a voicemail terminating her employment at IFCJ and stated it was at Rabbi Eckstein's request.

55. After reporting these issues to Rabbi Eckstein and his daughter, Defendant fired Miles-Cacella instead of disciplining Mamo.

56. Plaintiff was terminated December 31, 2017.

57. Defendant failed to pay Plaintiff her rightly earned raise of $25,000.00 for 2016 and 2017, or $50,000.00.

### b. Plaintiff Kennedy

58. Kennedy was hired by Defendant in 2008, and from 2012 until her last day at work for Defendant in 2018, was the Director of Interactive Fundraising for the IFCJ.

59. Kennedy's immediate supervisor was George Mamo, the Global Chief Operating Officer and Executive Vice President of IFCJ.

60. Kennedy's annual salary was $125,000.00 per year in 2018, not including benefits.

61. Kennedy was repeatedly sexually harassed by Mamo.

62. To wit, numerous times throughout 2017, Mamo came into Kennedy's office or called Kennedy into his office and stared at her breasts.

63. Numerous times throughout 2017, Mamo suggestively spread his legs during meetings with Kennedy and other female employees.

64. Numerous times throughout 2017, Mamo yelled at Kennedy in front of her colleagues. Mamo also yelled at other women in the same manner, in Kennedy's presence. Mamo did not regularly treat male employees this way.

65. This intimidating and harassing behavior created a hostile work environment which seriously affected her work-life as well as her mental and emotional well-being.

66. Kennedy complained about Mamo's behavior to Rabbi Eckstein as well as to Rabbi Eckstein's daughter, in phone conversations, emails, and texts. Upon information and belief, Mamo was never disciplined and Mamo's behavior never changed.

67. On information and belief, Mamo engaged in an affair with a female employee in 2014. That female employee was subsequently promoted to Vice President.

68. In September of 2017, Mamo told Kennedy that she would not be considered for a promotion to Vice President because she didn't "play nice," which Kennedy understood to mean that she would not be considered for a promotion to Vice President because she was a woman who had complained about Mamo's harassment and abuse, and who would not sleep with Mamo.

69. On February 2, 2018, feeling that the workplace at IFCJ would never change, that she would continue to be subjected to Mamo's abuse and harassment, and that she would be further punished by Mamo for having reported his behavior to his supervisors, Kennedy resigned.

## CLAIMS FOR RELIEF

I. **Kennedy: Sexual Harassment – Hostile Work Environment under Title VII (42 U.S.C. §§ 2000e-2)**

68. Plaintiffs re-allege Paragraphs 1-67 and incorporate them as though fully set forth herein as Paragraph 68.

69. Kennedy found IFCJ employee George Mamo's behavior offensive and harassing.

70. Mamo's conduct at issue was based on sex.

71. This harassment unreasonably interfered with Kennedy's work performance by creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being.

72. This harassment was so severe or pervasive as to alter the conditions of Kennedy's employment and create an abusive working environment.

73. This harassment was both objectively and subjectively offensive.

74. At all times relevant to the Complaint, Mamo had authority to take tangible employment actions against Kennedy *i.e.*, to effect a significant change in employment status, such as hiring,

9

firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

### II. Kennedy: Sexual Harassment – Hostile Work Environment under the IHRA (775 ILCS 5/2 102(D))

75. Plaintiff Kennedy re-alleges Paragraphs 1-74 and incorporates them as though fully set forth herein as Paragraph 75.

### III. Miles-Cacella: Retaliation for Reporting/Opposing Sexual Harassment and Gender Discrimination in Violation of Title VII (42 U.S.C. §§ 2000e-2)

76. Plaintiffs re-allege Paragraphs 1-75 and incorporates them as though fully set forth herein as Paragraph 76.

77. Miles-Cacella reported Mamo's sexually harassing conduct to coworkers and superiors including Rabbi Eckstein, IFCJ founder and president.

78. At all times, Miles-Cacella met the legitimate expectations of their employer.

79. Miles-Cacella was terminated as a result of reporting sexual harassment and gender discrimination to her superiors.

80. These adverse employment actions (e.g. change of employment terms and conditions and subsequent termination) followed Miles-Cacella's complaints of sexual harassment within a short period of time, thereby raising an inference of retaliatory motivation.

81. Miles-Cacella was treated less favorably than other similarly situated employees who did not engage in the statutorily protected activity of complaining about sexual harassment.

### IV. Miles-Cacella: Retaliation for Reporting/Opposing Sexual Harassment and Gender Discrimination in Violation of IHRA (775 ILCS 5/6 - 101(A))

82. Plaintiff Miles-Cacella re-alleges Paragraphs 1-81 and incorporates them as though fully set forth herein as Paragraph 82.

**V.     Miles-Cacella and Kennedy: Gender Discrimination in Violation of Title VII (42 U.S.C. §§ 2000e-2)**

83.     Plaintiffs Miles-Cacella and Kennedy re-allege Paragraphs 1-82 and incorporates them as though fully set forth herein as Paragraph 83.

84.     Defendant discriminated against Plaintiffs, females, due to their gender by subjecting them, and other female employees, to disparate treatment and unequal terms and conditions of employment by:

      a. Subjecting Kennedy to a pattern and practice of hostile work environment due to sexual harassment;

      b. Retaliating against Miles-Cacella for reporting acts of sexual harassment;

      c. Failing to timely and adequately address Miles-Cacella's complaints;

      d. Subjecting Plaintiffs to Mamo's conduct when complaints had been made against him prior and the Defendant failed to act; and

      e. By terminating Miles-Cacella.

85.     At all times, Plaintiffs performed their job according to Defendant's legitimate expectations.

86.     The Defendant treated similarly situated male employees outside the protected class more favorably.

**VI.    Miles-Cacella and Kennedy: Gender Discrimination in Violation of IHRA (775 ILCS 5/2-102(A))**

87.     Plaintiffs Miles-Cacella and Kennedy re-allege Paragraphs 1-86 and incorporate them as though fully set forth herein as Paragraph 87.

**VII.   Miles-Cacella:  Violation of the Illinois Wage Payment and Collection Act (820 ILCS 115/1)**

11

88. Plaintiff Miles-Cacella re-alleges Paragraphs 1-87 and incorporates them as though fully set forth herein as Paragraph 88.

89. At all times, Plaintiff was an employee under 820 ILCS 115/2.

90. At all times, Defendant was an employer under 820 ILCS 115/2.

91. Defendant and Plaintiff entered into an employment agreement whereby the Defendant would pay Plaintiff a yearly salary of $200,000.00.

92. Defendant and Plaintiff agreed to raise Plaintiff's salary by $50,000.00 after a positive 6-month performance review.

93. Defendant failed to perform a 6-month performance review. However, Defendant and Plaintiff did engage in a 1-year performance review. Plaintiff was given a positive review.

94. Under the IWPCA,

> Payments to separated employees shall be termed "final compensation" and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the two parties. IWPCA (820 ILCS 115/2)

95. Defendant failed to adhere to the terms of the employment agreement and did not pay Plaintiff her earned bonus.

96. Therefore, Defendant violated the IWPCA and Miles-Cacella has suffered damages.

### V. PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, the Plaintiffs respectfully request that this Court provide the following injunctive, equitable and monetary relief to the extent permissible under applicable law:

    a. Enter judgment in each Plaintiff's favor and against the Defendant;

    b. Award back pay from the date of termination/constructive discharge, compensatory damages including future pecuniary losses, front pay, emotional pain, suffering inconvenience, mental anguish, loss of enjoyment of life and other pecuniary losses;
    c. Award each Plaintiff punitive and/or exemplary damages against the Defendant;
    d. Award all applicable state penalties and liquidated damages, including available punitive damages;
    e. Award reasonable attorney's fees, expert witness fees, expenses and Plaintiffs' costs;
    f. Grant such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all claims and issues that may be tried to a jury.

Dated: November 14, 2018                           Respectfully submitted,

                                               **LEAH MILES-CACELLA, and**
                                               **MARGARET KENNEDY**

                             By:  /s/ Amy S. Cramer
                                   /s/ Thomas M. Cramer
                                   Amy S. Cramer (ARDC No. 6308140)
                                   acramer@cramerlawchicago.com
                                   Thomas M. Cramer (ARDC No. 6322468)
                                   tcramer@cramerlawchicago.com
                                   Cramer Law Chicago, P.C.
                                   180 N. LaSalle Street
                                   Suite 3700
                                   Chicago, Illinois 60601
                                   312-924-0219

                                   /s/ Richard Gleason
                                   Richard Gleason (ARDC No. 6286250)
                                   richard.gleason@ogolawyers.com
                                   O'Mara, Gleason, & O'Callaghan, LLC
                                   230 W. Monroe Suite 2620
                                   Chicago, IL 60606
                                   312.600.5588